NF

**FILED**

APR 29 2005 NF.

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Fortune Brands, Inc. | ) ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) No. **05C 2579** ) |
| Marsh Inc. and Marsh USA Inc. | ) ) ) |
| Defendants. | ) ) ) ) |

JUDGE NORDBERG

MAGISTRATE JUDGE NOLAN

## COMPLAINT

Fortune Brands, Inc. ("Fortune Brands"), by its attorneys, brings this complaint against Marsh Inc. and Marsh USA Inc. for a trial by jury and states as follows:

### PARTIES

1. Fortune Brands is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Lincolnshire, Illinois.

2. Marsh Inc. is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in New York. Marsh Inc.'s Global Broking department in New York originated, planned, and implemented the wrongful acts described in this Complaint.

3. Marsh USA Inc. is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in New York. Marsh USA Inc. entered into the contracts described in this Complaint.

### JURISDICTION AND VENUE

4. Because the civil action arises under the Sherman Act, 15 U.S.C. § 1, this Court has subject matter jurisdiction pursuant to section 4 of the Clayton Act, 15 U.S.C. § 5, and 28

U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367.

5. Marsh Inc. and Marsh USA Inc. are subject to personal jurisdiction in this district because they engage in systematic and regular business in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Marsh Inc. and Marsh USA Inc. are subject to personal jurisdiction in this district and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## SUMMARY OF CLAIMS

7. This is an action for treble damages and attorneys' fees under the Sherman Act and forfeiture of compensation under state law. During the 1999 to 2004 period, Marsh Inc. and Marsh USA Inc. (collectively "Marsh") received over $4,000,000 in fees and over $800,000 in additional compensation for serving as Fortune Brands' insurance broker. Fortune Brands paid over $40,000,000 in insurance premiums for insurance policies placed by Marsh during this period. Marsh promised Fortune Brands during this period that it would act in the best interests of Fortune Brands to obtain cost-effective insurance. It also promised that it would respond truthfully to any questions Fortune Brands had about the amount of additional compensation received by Marsh.

8. Through the actions of its Global Broking department in New York, Marsh supervised bid rigging by excess casualty insurers. The bid rigging supervised by Marsh harmed Fortune Brands as a consumer of excess casualty insurance. As Marsh knew, the direct effect of the bid rigging was to inflate the price that consumers of excess casualty coverage paid for insurance. In addition, Marsh misrepresented the amount of additional compensation or contingent commissions it received as Fortune Brands' insurance broker throughout the 1999 to 2004 period. Fortune Brands repeatedly asked Marsh about the amount of contingent commissions and Marsh repeatedly misled Fortune Brands.

9. As a result of its bad faith conduct, Marsh should return the compensation it kept for serving as a broker on behalf of Fortune Brands. Marsh should also be held accountable for the damages caused by the bid rigging.

## FACTS

### Fortune Brands' Relation with Marsh

10. Marsh served as Fortune Brands' insurance broker for many years. As Fortune Brands' insurance broker, Marsh claimed to act in Fortune Brands' best interest for the express purpose of purchasing cost-effective insurance.

11. Marsh prepared client service agreements for signature by Fortune Brands. In a client service agreement signed by Marsh and Fortune Brands in 2002, Marsh stated that the agreement's "purpose . . . is to give you an overview of what you can expect from us," that "[o]ur objective is to contribute our experience, facilities and energies toward the achievement of your goals," that we will "work with you to manage risk and control costs," that we will "[d]evelop, recommend, negotiate and implement cost-effective insurance and/or risk financing programs," that "[w]e represent you, not the insurance company," and that we will "[n]egotiate on your behalf with insurance companies and keep you informed of significant developments."

12. As to Marsh's compensation in 2002, Marsh identified in the agreement its annual fee and stated that Marsh may receive contingent commissions from insurers but did not indicate the amount. Marsh has described contingent commissions as payments it collects from an insurer based on the volume of business or the profitability of the business it places with the insurer.

13. In February 2003, Marsh prepared and sent Fortune Brands a client service agreement that increased the annual fee that Marsh received. In this client service agreement, Marsh stated that it may receive contingent commissions from insurers but did not indicate the amount. Marsh further promised that it will respond with additional information about contingent commissions upon Fortune Brands' request.

14. In 2004, Marsh prepared and sent another client service agreement, which Marsh and Fortune Brands signed effective January 1, 2004. In both the 2003 and 2004 client service agreements, Marsh stated that it "is engaged as the Client's insurance, risk management and risk financing advisor and insurance broker," that Marsh will "negotiate on the Client's behalf with insurers and keep the Client informed of significant developments," that Marsh will "represent and assist the Client in all discussions and transactions with all insurers," that Marsh will "[u]se its best efforts to place insurance on behalf of" Fortune Brands, and that Marsh will "[a]ct as a liaison between the Client and insurers."

15. In the 2004 client service agreement, Marsh increased the annual fee and stated that it may collect contingent commissions from insurers but did not state the amount. Marsh further promised that it will respond with additional information about contingent commissions upon Fortune Brands' request.

16. In the 2004 agreement and earlier, Marsh stated that Fortune Brands is entitled to books and records relating to the account and that Marsh will maintain the records for at least five years after expiration of each insurance policy it places on behalf of Fortune Brands.

17. Fortune Brands requested data on the amount of contingent commissions Marsh received for the period 1999 to 2004 on November 3, 2004 and subsequently. Marsh has failed to respond with accurate, current, and complete information.

### Bid Rigging

18. Excess casualty insurance accounts for a significant portion of the insurance premiums that Fortune Brands paid to insurance companies during the period covered by this Complaint. Companies purchase excess casualty insurance to protect themselves from large liability claims by third parties that exceed the limits of their primary liability insurance. It is necessary for companies such as Fortune Brands to purchase excess casualty insurance to control the risks to their business from these types of claims.

19. From January 1, 2000 to December 31, 2002, Fortune Brands had a three-year program in place that established the price that Fortune Brands paid for excess casualty

insurance. Fortune Brands purchased its lead layer of excess casualty insurance from AIG during those years. AIG was a leading excess casualty insurer in the United States at the time.

20. In the spring and summer of 2002, Fortune Brands held discussions with Marsh concerning Fortune Brands' purchase of excess casualty insurance effective after December 31, 2002. On August 8, 2002, Fortune Brands and Marsh met concerning Fortune Brands' upcoming purchase of excess casualty insurance. The subject matter of the discussions between Fortune Brands and Marsh in July and August included the nature of information that Marsh would submit to insurers on Fortune Brands' behalf to permit them to prepare and submit their bids for Fortune Brands' excess casualty business.

21. On September 17, 2002, Marsh met with Fortune Brands to discuss Fortune Brands' purchase of excess casualty insurance. Marsh told Fortune Brands at the meeting to expect that AIG and other insurers would propose a drastic increase in the price for excess casualty coverage. Fortune Brands told Marsh that Fortune Brands was open to consider purchasing excess casualty insurance from an insurance carrier other than AIG.

22. Because of the significance of the excess casualty insurance that Fortune Brands intended to purchase to be effective January 1, 2003, Fortune Brands and Marsh together conferred directly with bidders. On November 5, 2002, four Fortune Brands employees and several Marsh employees held separate meetings in New York with three excess casualty insurers, including AIG and Zurich. A few days later, Fortune Brands along with Marsh participated in a telephone conference with ACE, another excess casualty insurer. Thereafter, AIG, Zurich, and ACE each prepared and submitted to Marsh bids for Fortune Brands. In addition to AIG, Zurich and ACE were two other leading excess casualty insurers.

23. Since 2002 or earlier, Marsh, ACE, AIG, and Zurich agreed to rig the bids that the carriers made for excess casualty insurance coverage in the United States. ACE, AIG, and Zurich agreed with Marsh that they would each submit noncompetitive bids for the business of some customers to guarantee that the incumbent insurance carrier would retain the business of a particular customer seeking to purchase excess casualty insurance. Marsh facilitated this bid

rigging agreement among the carriers because it resulted in the payment of substantial contingent commissions to Marsh.

24. On December 17, 2002, Patricia Abrams, then an Assistant Vice President in the Excess Casualty Division of ACE, prepared a bid of $990,000 for Fortune Brands and submitted it to Marsh's Greg Doherty, a senior vice president of the Global Broking department operating in New York. The bid concerned the lead layer or first layer of Fortune Brands' excess casualty insurance.

25. On December 17, 2002, Marsh's Greg Doherty asked ACE's Patricia Abrams to increase the bid to $1,100,000 in order to be less competitive and thereby enable the incumbent, AIG, to retain the business. Later that day, ACE raised the bid and submitted to Marsh a bid of $1,100,000.

26. ACE's increased quote made its bid less competitive as compared to the bid that AIG submitted. Marsh received contingent commissions from AIG tied to the amount or profitability of the business Marsh placed with AIG.

27. On December 18, an ACE employee explained in writing to another employee at ACE that "we were more competitive than AIG in price and terms. MMGB [Marsh & McLennan Global Broking] requested we increase premium to $1.1M to be less competitive, so AIG does not loose [sic] the business."

28. In an email from Fortune Brands' Director of Risk Management to Marsh dated December 19, 2002, Fortune Brands expressed dissatisfaction about terms proposed by AIG regarding coverage for 2003. Fortune Brands' Director of Risk Management further stated to Marsh that "I assume that you are currently in serious discussions with other potential underwriters" and that "I am very serious about wanting to give another insurer the opportunity to provide Fortune's coverage in this layer."

29. In late December 2002, Marsh sent written bids to Fortune Brands and held discussions with Fortune Brands about bids. Marsh was aware of the original low bid from ACE but did not inform Fortune Brands about it.

30.     Relying on Marsh's misrepresentations about the bids received, Fortune Brands instructed Marsh on December 31, 2002 to accept the AIG bid. AIG served as Fortune Brands' lead excess casualty insurer during 2003 and 2004.

31.     In an email dated June 20, 2003 concerning additional Marsh business, Greg Doherty stated in writing to ACE that "[c]urrently, we have about $6 million in new business which is the best in Marsh Global Broking so [we] do not want to hear that you are not doing 'B' quotes or we will not bind anything." In this manner, Marsh's Global Broking department used the carrot of its clients' business ("$6 million in new business") and the stick of withholding its clients' business ("or we will not bind anything") to induce ACE to continue to submit artificially high bids.

32.     The bid rigging that Marsh instigated in 2002 concerned the lead layer of excess casualty insurance purchased by Fortune Brands. As Marsh fully understood, an increase in the price charged by the lead excess casualty insurer resulted in an increase in the price of additional layers of excess casualty insurance. Marsh's 2002 bid rigging caused Fortune Brands to pay over $1,300,000 in inflated excess casualty premiums during the 2003 to 2004 period.

33.     In plea agreements with the State of New York, current or former employees of the participating excess casualty insurers and Marsh admitted that they agreed to rig bids in a scheme Marsh coordinated. This includes the plea agreements of: Joshua Bewley, former Managing Director of Marsh's Global Broking department; Robert Stearns, former Marsh Senior Vice President; Kathryn Winter, former Managing Director of Marsh's Global Broking department; Patricia Abrams, former Assistant Vice President in the Excess Casualty Division of ACE; Carlos Coello, former AIG employee; John Mohs, former AIG Assistant Manager; Karen Radke, former AIG employee; Jean-Baptist Tateossian, former head of AIG's Marsh unit; Edward Coughlin, former Senior Underwriter in the Excess Casualty Unit of Zurich; and John Keenan, former Senior Underwriter in the Excess Casualty Unit of Zurich and also a former AIG employee.

34. The bid rigging coordinated by Marsh caused harm to Fortune Brands as a result of the 2002 transaction described above. Upon information and belief, the bid rigging caused harm to Fortune Brands on additional transactions.

### Misrepresenting the Amount of Additional Compensation

35. Marsh misrepresented and concealed the amount of compensation it received as Fortune Brands' insurance broker. Marsh's Global Broking department in New York entered into and managed agreements with insurers, including ACE, AIG, and Zurich, for payment of contingent commissions to Marsh based on the volume or the profitability of the business Marsh placed with the insurers.

36. In 1999, Fortune Brands' Director of Risk Management expressed concern to Marsh about the impact of this additional compensation on Marsh's behavior. Fortune Brands stated to Marsh that the contingent commission arrangements create a conflict of interest and that Marsh needed to make full disclosure to Fortune Brands of the contingent commission amounts.

37. Marsh stated to Fortune Brands in 1999 that contingent commissions merely serve to offset Marsh's expenses for performing some technical or administrative services for insurers.

38. In 1999, Marsh prepared a confidentiality agreement, which Marsh and Fortune Brands signed effective April 8, 1999, concerning Marsh's future disclosure of contingent commission data. The agreement required Marsh to provide data enabling Fortune Brands to estimate the annual amount of contingent commissions received by Marsh as Fortune Brands' insurance broker.

39. Following this agreement, Marsh made repeated misrepresentations and omissions during the 1999 to 2004 period concerning the annual amount of contingent commissions it collected and retained as Fortune Brands' insurance broker.

40. In a fax to Fortune Brands dated May 18, 1999, Anthony Gagliardi of Marsh stated that in 1998 Marsh received an estimated $21,885 in contingent commissions as Fortune Brands' broker.

41. In an email to Fortune Brands dated July 10, 2001, Anthony Gagliardi of Marsh stated that in 2000 Marsh received an estimated $21,885 in contingent commissions. He also stated in this email that the 2001 sum would be within $2000, higher or lower, of $21,885.

42. In 2002, James Hagelow of Marsh stated to Fortune Brands' Director of Risk Management that Marsh received an estimated $22,000 of contingent commissions in 2001 and would receive an estimated $22,000 in 2002.

43. In written presentations to the audit committee of the board about insurance costs, Fortune Brands' Director of Risk Management relied upon Marsh's representations and reported that Marsh received about $22,000 of contingent commissions in 2000, 2001, and 2002.

44. In early 2004, James Hagelow of Marsh stated to Fortune Brands' Director of Risk Management that Marsh received $29,000 in contingent commissions in 2003 and would receive a similar amount in 2004. Fortune Brands' Director of Risk Management recorded the $29,000 sum in a writing used to prepare for an audit committee presentation made in 2004 concerning Fortune Brands' insurance costs in 2003 and 2004.

45. In late 2004 and early 2005, Marsh informed Fortune Brands that it collected the following amount of contingent commissions: $85,265 in 2001, $80,072 in 2002, and $585,581 in 2003. Marsh computed these contingent commission amounts for the 2001 to 2003 period without accounting for a large amount of premiums paid by Fortune Brands for insurance placed by Marsh. Marsh provided information for part of 2004 and has not provided any of the contingent commission amounts requested for 1999 and 2000.

46. On February 15, 2005, Joshua Bewley, former Managing Director of Marsh's Global broking department, entered into a guilty plea with the State of New York in which he admitted that during the 1999 to 2004 period Marsh's Global Broking department gave clients misleading information when they asked Marsh about the amount of contingent commissions.

## CLAIMS AGAINST MARSH

### Count 1: Per Se Illegal Violation of Sherman Act § 1

47. Fortune Brands repeats the allegations made in the preceding paragraphs as if fully set forth herein.

48. The activities of Marsh and the excess casualty insurers that participated in the bid rigging scheme as described in this Complaint are within the flow of, and substantially affected, interstate commerce. During the period referenced in this Complaint, Marsh arranged for the sale and purchase of excess casualty insurance in New York, Illinois, and other states.

49. Marsh orchestrated and supervised a scheme among competing excess casualty insurers to engage in bid rigging. The scheme included the agreement to fix the price that Fortune Brands paid for excess casualty coverage by rigging the bid that ACE submitted to Fortune Brands. The bid rigging agreement is a per se illegal agreement that set the minimum price that ACE would bid for Fortune Brands' excess casualty coverage. The bid rigging agreement artificially inflated ACE's bid and thereby fixed and inflated the price that Fortune Brands paid for excess casualty insurance coverage.

50. As a direct and proximate result of the agreement in restraint of trade, Fortune Brands suffered injury to its business and property.

### Count 2: Unreasonable Restraint of Trade in Violation of Sherman Act § 1

51. Fortune Brands repeats the allegations made in the preceding paragraphs as if fully set forth herein.

52. The activities of Marsh and the excess casualty insurers that participated in the bid rigging scheme as described in this Complaint are within the flow of, and substantially affected, interstate commerce. During the period referenced in this Complaint, Marsh arranged for the sale and purchase of excess casualty insurance in New York, Illinois, and other states.

53. The sale of excess casualty insurance in the United States is a relevant product market. The relevant geographic market in which Marsh's antitrust violation occurred is the

United States. Other insurance products or risk management products are not reasonably interchangeable with or economic substitutes for excess casualty insurance sold in the United States. Fortune Brands and other customers require excess casualty insurance in the United States for protection from large liability claims by third parties. They would not substitute to other products in response to an appreciable and lasting price increase imposed by excess casualty insurers with market power.

54. ACE, AIG, and Zurich are leading competitors in the relevant market and collectively have market power. Together they account for a substantial share of the sales of excess casualty insurance coverage in the relevant market and have the ability to restrain trade to the detriment of consumers.

55. Marsh orchestrated and supervised a scheme among competing excess casualty insurers to engage in bid rigging. Marsh and the participating excess casualty insurers agreed to fix the price that Fortune Brands and other consumers paid for excess casualty insurance coverage.

56. Consumers in the relevant market suffered harm as a direct result of the bid rigging agreements described in the Complaint. The bid rigging agreements injured competition in the market for excess casualty insurance by artificially inflating the price consumers of excess casualty insurance paid for insurance coverage.

57. As a direct and proximate result of an agreement in restraint of trade, Fortune Brands suffered injury to its business and property.

**Count 3: Fraud**

58. Fortune Brands repeats the allegations made in the preceding paragraphs as if fully set forth herein.

59. Marsh intentionally misrepresented and concealed material facts. Fortune Brands reasonably relied on Marsh's misrepresentations and omissions and suffered harm as a result.

### Count 4: Negligent Misrepresentation

60. Fortune Brands repeats the allegations made in the preceding paragraphs as if fully set forth herein.

61. Marsh and Fortune Brands had a relationship of trust in which Marsh had a responsibility to communicate accurate information.

62. Marsh intentionally or negligently misrepresented material facts to Fortune Brands and concealed material facts from Fortune Brands. Fortune Brands reasonably relied on Marsh's misrepresentations and omissions and suffered harm as a result.

### Count 5: Negligence

63. Fortune Brands repeats the allegations made in the preceding paragraphs as if fully set forth herein.

64. As Fortune Brands' insurance broker, Marsh failed to exercise reasonable diligence and perform with the skill or care ordinarily possessed by companies acting in its capacity. As a result of Marsh's negligence, Fortune Brands suffered harm.

### Count 6: Breach of Fiduciary Duty

65. Fortune Brands repeats the allegations made in the preceding paragraphs as if fully set forth herein.

66. Marsh and Fortune Brands had a fiduciary relationship in which Marsh had a responsibility to provide services and advice for the benefit of Fortune Brands.

67. Marsh intentionally breached its fiduciary duty and Fortune Brands suffered harm as a result.

### Count 7: Tortious Interference with Prospective Business Relations

68. Fortune Brands repeats the allegations made in the preceding paragraphs as if fully set forth herein.

69. Fortune Brands had a reasonable expectation of entering into a valid business relationship with ACE or another bidder upon submission of a competitive bid. With knowledge and understanding of Fortune Brands' expectation, Marsh wrongfully interfered with Fortune

Brands' prospective business relations. Marsh interfered by engaging in wrongful acts that it knew would harm Fortune Brands. As a result of Marsh's interference, Fortune Brands suffered harm.

### Count 8: Deceptive Business Practices

70. Fortune Brands repeats the allegations made in the preceding paragraphs as if fully set forth herein.

71. Fortune Brands acted as a consumer for purposes of its purchase of insurance broking services through Marsh.

72. In misrepresenting and concealing the actual amount of commissions received from insurers, Marsh employed deceptive acts and practices. Marsh intended to induce Fortune Brands to rely upon Marsh's misrepresentations concerning the amount of commissions received.

73. Marsh's conduct violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*

74. Fortune Brands was injured as a result of Marsh's violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

75. A finding of liability would serve the interests of consumers by creating disincentives for insurance brokers to deceive their clients and to conceal material facts concerning insurance.

### Count 9: Breach of Contract

76. Fortune Brands repeats the allegations made in the preceding paragraphs as if fully set forth herein.

77. Marsh and Fortune Brands entered into contracts.

78. Fortune Brands performed its conditions of the contracts.

79. Marsh breached the contracts by failing to provide proper advice to assist Fortune Brands in managing insurance costs; by failing to represent the interests of Fortune Brands rather than the insurers; by failing to recommend, negotiate, and implement cost-effective insurance; by

failing to negotiate on Fortune Brands' behalf; by failing to keep Fortune Brands informed of significant developments; by failing to use its best efforts to place insurance on behalf of Fortune Brands; by failing to provide requested information about additional compensation; and by failing to provide documents and other information requested by Fortune Brands.

80. As a result of Marsh's obvious and flagrant breaches, Fortune Brands suffered harm.

## PRAYER FOR RELIEF

Fortune Brands asks the Court to grant the following:

A. Treble damages and attorneys' fees as remedies for Marsh's violations of the Sherman Act;

B. Forfeiture of compensation retained by Marsh; restitution of payments received from Fortune Brands; damages caused by Marsh's conduct; punitive damages owing to the malicious, willful, and wanton nature of Marsh's conduct; prejudgment interest; and attorneys' fees as remedies for Marsh's violations of state law; and

C. All other relief that the Court deems just and proper.

## JURY TRIAL

Fortune Brands requests a trial by jury.

Respectfully submitted,

*[signature]*

Ernest Summers III
Lisa C. Sullivan
Howrey LLP
321 North Clark Street, Suite 3400
Chicago, Illinois 60610
(312) 595-1239

Michael G. Cowie
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 783-0800

Attorneys for Fortune Brands, Inc.